UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| PHARMACY CORPORATION OF AMERICA d/b/a PHARMERICA | ) ) ) |
| and | ) ) |
| PHARMERICA DRUG SYSTEMS LLC d/b/a PHARMERICA | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) CASE NO. 3:18-cv-754-DJH |
| PREMIER HEALTHCARE MANAGEMENT, LLC | ) ) ) ) |
| and | ) ) |
| CHAMPAIGN URBANA NURSING AND REHAB, LP | ) ) ) ) |
| and | ) ) |
| COURTYARD HEALTHCARE CENTER, LLC D/B/A COURTYARD HEATHCARE CENTER | ) ) ) ) ) |
| and | ) ) |
| GARDENVIEW MANOR, LLC D/B/A GARDENVIEW MANOR | ) ) ) ) |
| and | ) ) |
| GILMAN HEALTHCARE CENTER, LLC D/B/A GILMAN HEALTHCARE CENTER | ) ) ) ) |
| and | ) ) |
| NORRIDGE GARDENS, LLC D/B/A NORRIDGE GARDENS | ) ) ) |

| | |
|---|---|
| and | ) |
| | ) |
| PERSHING GARDENS HEALTHCARE | ) |
| CENTER, LLC D/B/A PERSHING | ) |
| GARDENS HEALTHCARE CENTER | ) |
| | ) |
| and | ) |
| | ) |
| WINFIELD WOODS HEALTHCARE | ) |
| CENTER, LLC D/B/A WINFIELD | ) |
| WOODS HEALTHCARE CENTER | ) |
| | ) |
| Defendants. | ) |
| | ) |

## COMPLAINT

Plaintiffs, Pharmacy Corporation of America d/b/a PharMerica and PharMerica Drug Systems, LLC d/b/a PharMerica (collectively "PharMerica"), state as follows for their Complaint against Defendants: Champaign Urbana Nursing and Rehab, LP ("Champaign"), Courtyard Healthcare Center, LLC d/b/a Courtyard Healthcare Center ("Courtyard"), Gardenview Manor, LLC d/b/a Gardenview Manor ("Gardenview"), Gilman Healthcare Center, LLC d/b/a Gilman Healthcare Center ("Gilman"), Norridge Gardens, LLC d/b/a Norridge Gardens ("Norridge"), Pershing Gardens Healthcare Center, LLC d/b/a Pershing Gardens Healthcare Center ("Pershing"), and Winfield Woods, LLC d/b/a Winfield Woods Healthcare Center ("Winfield") (collectively "Facility Operators"), and Premier Healthcare Management, LLC ("Premier") (Facility Operators and Premier are collectively referred to as "Defendants"):

### NATURE OF THE ACTION

1. This action arises out of Defendants' failure to pay PharMerica for the amounts owing pursuant to the parties' December 1, 2012 Pharmacy Services Agreement, as amended on April 1, 2013, January 1, 2014, February 24, 2014, and June 1, 2014 (as amended, the "PSA"),

attached as **Exhibit A**,[1] as well as amounts owed under seven Settlement and Forbearance Agreements (the "Settlement Agreements") Defendants executed in favor of PharMerica in September 2017. A copy of the seven Settlement and Agreements executed by Premier and each of the Facility Operators are attached at **Exhibit B**.

2. PharMerica performed all obligations of it under the PSA and the Settlement Agreements, including satisfying any and all conditions precedent to payment.

### THE PARTIES

3. Pharmacy Corporation of America is a California corporation with its principal place of business in Louisville, Kentucky. Thus, for purposes of federal diversity jurisdiction, Pharmacy Corporation of America is a citizen of California and Kentucky.

4. PharMerica Drug Systems, LLC is a Delaware limited liability company with its principal place of business in Louisville, Kentucky. The sole member of PharMerica Drug Systems, LLC is Pharmacy Corporation of America. Thus, for purposes of federal diversity jurisdiction, PharMerica Drug Systems, LLC is a citizen of California and Kentucky.

5. Premier is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Premier is a citizen of Illinois for purposes of federal diversity jurisdiction.

6. Champaign is an Illinois limited partnership, whose partners, upon information and belief, are citizens of Illinois. Therefore, Champaign is a citizen of Illinois for purposes of federal diversity jurisdiction.

---

[1] Due to the confidential nature of the pricing information contained in the PSA, PharMerica has provided it in redacted form. Upon request of the Court it will provide an unredacted copy of the PSA under seal.

7. Courtyard is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Courtyard is a citizen of Illinois for purposes of federal diversity jurisdiction.

8. Gardenview is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Gardenview is a citizen of Illinois for purposes of federal diversity jurisdiction.

9. Gilman is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Gilman is a citizen of Illinois for purposes of federal diversity jurisdiction.

10. Norridge is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Norridge is a citizen of Illinois for purposes of federal diversity jurisdiction.

11. Pershing is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Pershing is a citizen of Illinois for purposes of federal diversity jurisdiction.

12. Winfield is an Illinois limited liability company, whose members, upon information and belief, are citizens of Illinois. Therefore, Winfield is a citizen of Illinois for purposes of federal diversity jurisdiction.

13. The Facility Operators each own, operate, and hold the Medicare provider number for skilled nursing facilities in Illinois.

14. Premier is the ultimate parent, management, and controlling company of the Facility Operators.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

16. This Court has personal jurisdiction over Defendants because they consented to personal jurisdiction in the Western District of Kentucky under the Settlement Agreements, which provide, in relevant part, that the Defendants:

> CONSENT TO ONE OR MORE ACTIONS BEING INSTITUTED AND MAINTAINED IN THE […] UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION, TO ENFORCE THIS AGREEMENT OR ANY OTHER DISPUTE BETWEEN THE PARTIES, AND WAIVE ANY OBJECTION TO ANY SUCH ACTIONS BASED UPON LACK OF PERSONAL OR SUBJECT MATTER JURISDICTION[.]

*See* Settlement Agreements ¶ 6.09.

17. Venue is proper in this Court because Defendants and PharMerica consented to venue in the Western District of Kentucky under the Settlement Agreements, which provides, in relevant part, that the Defendants:

> CONSENT TO ONE OR MORE ACTIONS BEING INSTITUTED AND MAINTAINED IN THE […] UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY, LOUISVILLE DIVISION, TO ENFORCE THIS AGREEMENT OR ANY OTHER DISPUTE BETWEEN THE PARTIES, AND WAIVE ANY OBJECTION TO ANY SUCH ACTIONS BASED UPON […] IMPROPER VENUE.

*See* Settlement Agreements ¶ 6.09.

## STATEMENT OF FACTS

### *The PSA*

18. On or about December 1, 2012, as amended from time to time, PharMerica and Premier entered into the master PSA, whereby PharMerica agreed to provide pharmacy-related

goods and services to the residents of the seven skilled nursing facilities operated by the Facility Operators.

19. The initial term of the PSA was from December 1, 2012 through March 31, 2016. *See* PSA § 2. The PSA automatically renewed for successive one year terms unless the PSA was terminated in accordance with the terms therein. *Id.*

20. Under the PSA, Premier specifically represented and warranted that it was entering the contract for PharMerica to be the exclusive pharmacy provider to the residents of the facilities operated by the Facility Operators, *see id.* § 5, and Premier was responsible and liable for all obligations under the PSA along with the other Defendants. *See, e.g., id.* at Cover Sheet ¶ 1.

21. Pursuant to the PSA and PharMerica's performance thereunder, Defendants were obligated to pay for the pharmacy goods and services provided by PharMerica within ninety (90) days of the invoice date, *id.* § 6(D)(1), and Defendants' failure to do so would result in eighteen percent (18%) interest being charged on all outstanding amounts due. *Id.* §6(D)(2).

22. Defendants also agreed to pay for all of PharMerica's attorneys' fees and costs to the extent it was forced to initiate collection efforts for outstanding amounts owed. *Id.*

23. The PSA also allowed PharMerica to require Defendants to pay on a pre-payment basis, or suspend services for which the Defendants were financially responsible, if Defendants failed to timely pay PharMerica what was owed. *Id.* § 6(D)(3)(iii).

24. The PSA could only be terminated by providing the other party written notice of non-renewal not less than ninety (90) days prior to the expiration of the then current term and the termination would only be effective on the last day of the then effective term. *Id.* §7(A). If the

party desiring termination does not comply with the notice and timing requirements, the PSA automatically would renew for another successive year term. *Id.*

25. Even if the notice was otherwise in accordance with the requirements for termination of the PSA as set out in Section 7, any notice of termination issued by Defendants while outstanding amounts were due and owing was void, *id.* §7(D), and Defendants could not terminate the PSA unless they paid all amounts owed to PharMerica prior to termination. *Id.* § 6(D)(4).

26. Upon notice of termination of the PSA, all outstanding invoices became due thirty (30) days after the invoice date. *Id.* §7(C).

*Settlement Agreements and Agreed Judgment*

27. By mid-2017, Defendants were significantly in arrears for past due invoices under the PSA.

28. In September 2017, PharMerica, Premier, and the Facility Operators entered into seven Forbearance and Settlement Agreements ("Settlement Agreements") in order to settle outstanding amounts owed by Defendants to PharMerica under the PSA. Each of the Settlement Agreements was between PharMerica, on the one hand, and Premier and one of the seven Facility Operators, on the other hand. Other than the name of the Facility Operator and amount owed, the Settlement Agreements are materially identical. The Settlement Agreements, unless specifically stated otherwise therein, incorporated all terms of the PSA. *See* Settlement Agreements Recital A.

29. As an inducement for PharMerica to enter into the Settlement Agreements, Premier and the Facility Operators acknowledged that they were in default of their payment obligations under the PSA, *See id.* Recital B, and acknowledged the specific amount owed for all

services provided through and including May 31, 2017 for each Facility Operator and Premier (the "Old Balances") as follows:

    a. Gardenview and Premier: $135,077.60;

    b. Pershing and Premier: $62,877.54;

    c. Courtyard and Premier: $167,506.78;

    d. Champaign and Premier: $268,155.94;

    e. Winfield and Premier: $124,219.45;

    f. Norridge and Premier: $390,699.42; and

    g. Gilman and Premier: $96,905.64.

*See id.* § 5.01.

30. In order to settle the Old Balances, PharMerica agreed to accept payment of the Old Balances over twenty six (26) months, at five (5%) percent interest, as set out in the payment schedules attached as Attachment B to the Settlement Agreements, which Premier and the Facility Operators agreed to pay. *See id.* § 5.02 and Attachment B.

31. Section 4.01(a) of the Settlement Agreements provides that Defendants would be in default if they failed to pay any installment due and owing under the respective Settlement Agreements.

32. Section 5.03 of the Settlement Agreements provides that Premier and the Facility Operators would pay each invoice for services provided and/or invoiced after May 31, 2017, in accordance with the 90-day payment terms in the PSA, and failure to do so would be a default under the Settlement Agreements in addition to a breach under the PSA.

33. In exchange for the acknowledgments of Defendants of their debts and agreement to repay PharMerica as set forth in the Settlement Agreements, PharMerica agreed to forbear

from collecting the amounts due to it under the PSA so long as Defendants timely paid the amounts they promised to pay under the PSA.

34. Upon any default of the Settlement Agreements by Defendants, PharMerica was required to provide Defendants with notice and to not take action against them for ten days during which Defendants would have the opportunity to cure the default. *Id.* § 4.02.

35. Defendants agreed that if they defaulted and failed to cure the default, PharMerica would be entitled to seek to have entered by a court the Agreed Orders of Judgment ("Agreed Orders") attached to the Settlement Agreements as Attachments C, which the Defendants had executed. *Id.* §§ 5.04 and 5.06.

36. Pursuant to Section 5.04 of the Settlement Agreements, Defendants agreed that by executing the respective Agreed Orders, their signatures constitute sufficient and proper evidence of the justness of the debt and their confession of the judgment and that no further evidence or appearance in open court is necessary before entry of the Agreed Orders by the court and, thereafter, execution upon the Agreed Orders.

37. Pursuant to the Agreed Orders, the Defendants agreed that upon an uncured default, each Facility Operator and Premier, jointly and severally, shall pay to PharMerica the Old Balances, less any payments paid in accordance with the payment terms of the Settlement Agreements, applied first to interest then to principal, plus all amounts owed for invoices for services issued after May 31, 2017, plus interest thereon at the rate of 18% per annum from the date of an uncured settlement default until paid in full, including after the date the judgment is entered. *See id.* §5.06 and Attachments C.

38. Additionally, pursuant to the Settlement Agreements and the Agreed Orders, Defendants agreed that upon an uncured default, they would be responsible for paying all of

PharMerica's "reasonable costs and expenses of collection, including but not limited to, reasonable attorneys' fees and court costs. This includes any costs and expenses in any action or proceeding, including but not limited to enforcing [the Settlement Agreements] and executing upon the [Agreed Orders]; it further includes, but is not limited to, reasonable fees and disbursements of attorneys incurred before such action or proceeding is commenced, and before, during, and after any trial, arbitration, or mediation; and on any appeal, whether the action or proceeding is at law, in equity, or in any bankruptcy case or proceeding." *Id.* § 6.04 and Attachments C.

39. Finally, under Section 5.09 of the Settlement Agreements, Defendants acknowledged agreed "that the Old Balance[s] constitutes invoices that were not paid pursuant to the terms identified in Section 6 of the PSA. As such, Section 7(D) of the PSA shall remain in full force and effect while any amounts under [Settlement Agreements] are due and owing, and [Defendants] may not terminate the PSA while amounts are due hereunder, and any termination notice issued by [Defendants] shall be void."

*Defendants' Multiple Uncured Defaults Under the PSA and the Settlement Agreements*

40. Defendants quickly got in arrears again under both the PSA for invoices for services after May 31, 2017 and under the payment terms and schedules of the Settlement Agreements.

41. On or about January 10, 2018, PharMerica issued Defendants a notice of default under the Settlement Agreements due to their failures to pay the invoices after May 31, 2017 within ninety days (which was also a default under the PSA as well) and to make the payments as set out in Section 5.02 and Attachment B of the Settlement Agreements on the Old Balances. *See* January 10, 2018 Notice of Default, attached as **Exhibit C**.

42. Per the terms of the Settlement Agreements, PharMerica gave Defendants ten days, or until January 22, 2018, to cure the same.

43. In response, Defendants made payments towards the Settlement Agreements' past due installments; however, they did not cure on or before January 22, 2018 their failure to pay the post-May 31, 2017 invoices that were in arrears under the PSA and the Settlement Agreements.

44. Despite that Defendants did not fully cure the January 10, 2018 default, and without waiving any of its rights under the Settlement Agreements or the PSA, PharMerica continued to try and work with Defendants to get them current under the Settlement Agreements and the PSA.

45. For example, on January 22, 2018, PharMerica provided notice to Defendants that they were still in default under the Settlement Agreements and the PSA by failing to pay the post-May 31, 2017 invoices as they became due. *See* January 22, 2018 Notice of Default and COD Demand, attached as **Exhibit D**. However, rather than executing upon the Agreed Orders or stopping the provision of pharmacy goods and services to Defendants' residents, both of which PharMerica was contractually entitled to do, PharMerica agreed to continue providing uninterrupted services if Defendants paid for such services on a pre-payment, or COD, basis. *Id.*

46. Thereafter, through July 2018, and despite PharMerica's continuing efforts to work with Defendants as to the past due amounts, Defendants never fully became current on the amounts due to PharMerica. PharMerica issued multiple notices of default to Defendants during this time period, and in each instance Defendants failed to cure the identified defaults within ten days. *See* February 21, 2018 Notice of Default and COD Demand, attached as **Exhibit E**; May

10, 2018 Notice of Default, attached as **Exhibit F**; and June 21, 2018 Final Notice of Default, attached as **Exhibit G**.

47. PharMerica made a last ditch effort to get Defendants caught up under the PSA, Settlement Agreements, and then-outstanding COD payments through an August 2, 2018 Letter Amendment ("Letter Amendment"). *See* Letter Amendment, attached as **Exhibit H**. Defendants were required to make four monthly payments of $250,000 in August, September, October, and November 2018, as well as continuing to make the weekly COD payments of $71,000 ever Wednesday. If Defendants had paid according to the Letter Amendment, they would essentially no longer be in default under the PSA or the Settlement Agreements as of December 2018. However, if they failed to make the payments in accordance with the Letter Agreement, they would be in default under the PSA and Settlement Agreements, and PharMerica could exercise all rights and remedies under the same, including requesting immediate entry of Agreed Orders against Defendants.

48. Despite making the first two monthly payments due under the Letter Amendment, Defendants ultimately refused to execute the document. Further, Defendants failed to make the third installment, and discontinued even making weekly COD payments despite PharMerica's notice of the failure and demand for such payments.

49. Then, on October 29, 2018, Defendants' owner emailed PharMerica and stated that Defendants were terminating the PSA effective midnight on October 30, 2018 ("Termination Notice"), attached as **Exhibit I**.

50. On October 29, 2018, there were significant past due amounts owed by Defendants to PharMerica under the PSA and under the Settlement Agreements.

51. On October 30, 2018, Defendants discontinued ordering pharmaceutical goods and services from PharMerica ("Termination").

52. On October 30, 2018, there were significant past due amounts owed by Defendants to PharMerica under the PSA and under the Settlement Agreements.

53. Defendants' Termination Notice and Termination were in violation of Section 6 and 7 of the PSA, and Section 5.09 of the Settlement Agreements, which state that Defendants cannot provide notice of termination of the PSA or subsequently terminate the PSA when outstanding amounts were owed under either the PSA or the Settlement Agreements.

54. Defendants' Termination Notice and Termination were also in violation of Section 7(a) of the PSA because any notice of non-renewal and termination would only be effective on the last day of the then effective term, which would be March 31, 2019.

55. Defendants' Termination Notice rendered all of Defendants' outstanding invoices due within thirty (30) days of the invoice date.

56. As of the date of this Complaint, other than the October 2018 invoices, all other amounts owed by Defendants were past due, including amounts owed under the PSA for services provided and invoiced after May 31, 2017 and amounts owed under the Settlement Agreements. The October 2018 invoices will become due on November 30, 2018.

57. Because of Premier's and the Facility Operators uncured defaults, PharMerica is entitled to entry of the Agreed Orders against Premier and each of the Facility Operators in the amounts of the Old Balances, less any payments made under the Settlement Agreements, applied first to interest and then to principal, plus all unpaid invoice amounts for services provided at each Facility Operator's skilled nursing facility after May 31, 2017, plus interest at the rate of

18% per annum, starting on January 22, 2018 until paid in full, plus reasonable attorneys' fees and costs incurred in enforcing the terms of the Settlement Agreements and the Agreed Orders.

58. As a result of Defendants' uncured default, PharMerica is entitled to immediate entry of the Agreed Orders.

59. PharMerica has incurred attorneys' fees and other costs in preparing and filing this action, all of which are the responsibility of Defendants. PharMerica is likely to incur substantial additional attorneys' fees as this case is litigated and prepared for trial, which also shall be the responsibility of Defendants.

60. Upon information and belief, the Facility Operators have been reimbursed by Medicare for all or a significant portion of the goods and services provided by PharMerica, and Defendants have directly or indirectly benefited from such reimbursement to the detriment of PharMerica.

61. Upon information and belief, Defendants have reported PharMerica's invoice charges as valid expenses to Medicare on the Facility Operators' annual cost reports.

62. Upon information and belief, Defendants have reported invoice charges as valid expenses to the Internal Revenue Service for the purpose of reducing the amount of adjusted gross income on which the Facility Operators and/or their owners must pay taxes. As a result, the Facility Operators and/or their owners have or will pay lower taxes than they otherwise would have had to pay.

**COUNT I – BREACH OF CONTRACT – FAILURE TO PAY**

63. PharMerica incorporates by reference the allegations set forth above.

64. Defendants entered into the PSA with PharMerica which provides that Defendants are obligated to pay invoices for goods and services provided by PharMerica within ninety (90) days of the invoice date.

65. The PSA also provides that Defendants are obligated to pay invoices for goods and services provided by PharMerica within thirty (30) days of the invoice date upon notice of termination of the PSA.

66. Premier and the Facility Operators entered into the Settlement Agreements with PharMerica, which provide that Premier and the Facility Operators are obligated to pay invoices for goods and services provided and invoiced by PharMerica after May 31, 2017 within ninety (90) days of the invoice date.

67. Premier and the Facility Operators entered into the Settlement Agreements with PharMerica, which provide that Premier and the Facility Operators are obligated to make settlement payments per the payment schedules set forth in Attachment B of the Settlement Agreements.

68. The PSA and Settlement Agreements are valid and enforceable contracts.

69. PharMerica performed all of its obligations under the PSA and Settlement Agreements.

70. Without legal justification or cause, Premier and the Facility Operators materially breached the PSA and Settlement Agreements by failing to pay PharMerica sums due and owing for amounts invoiced after May 31, 2017 when those sums were due.

71. Without legal justification or cause, Premier and the Facility Operators materially breached the Settlement Agreements by failing to pay PharMerica settlement payments per the payment schedules set forth in Attachment B of the Settlement Agreements.

72. As a direct and proximate cause of Premier's and the Facility Operators' breaches of the PSA and Settlement Agreements, PharMerica has suffered damages in that it has not been paid sums to which it is entitled.

73. Pursuant to the PSA, Defendants are jointly and severally liable for all outstanding debts, which includes, but is not limited to, all amounts owed under the Settlement Agreements, as that constitutes past due invoices under the terms of the PSA.

74. Interest is accruing on the unpaid balance pursuant to the terms of the Settlement Agreements in the amount of eighteen (18%) percent from January 22, 2018 until paid in full.

75. Pursuant to the Settlement Agreements, PharMerica is entitled to entry of Agreed Orders of Judgment against Premier and each of the Facility Operators in the amounts of the Old Balances, less any payments made under the Settlement Agreements, applied first to interest and then to principal, plus all unpaid invoice amounts for services provided at each Facility Operator's skilled nursing facility after May 31, 2017, plus interest at the rate of 18% per annum, starting on January 22, 2018 until paid in full, plus reasonable attorneys' fees and costs incurred in enforcing the terms of the Settlement Agreements and the Agreed Orders.

### COUNT II – BREACH OF CONTRACT –
### IMPROPER TERMINATION OF THE PSA

76. Except to the extent inconsistent with the relief requested in the Count, PharMerica incorporates by reference the allegations set forth above.

77. Defendants entered into the PSA with PharMerica.

78. The PSA is a valid and enforceable contract.

79. PharMerica performed all conditions, covenants and promises on its part to be performed under the PSA.

80. Without legal justification or excuse, Defendants materially breached the PSA by purporting to terminate the PSA while amounts were due and owing to PharMerica under the PSA.

81. Without legal justification or excuse, Defendants materially breached the PSA by terminating prior to the then-current termination date of March 31, 2019, failing to give adequate notice under the PSA, discontinuing ordering pharmacy goods and services from PharMerica, and utilizing another pharmacy provider while amounts were due and owing to PharMerica under the PSA.

82. As a direct and proximate result of Defendants' breach of the PSA, PharMerica has suffered damages, including, but limited to, lost profits.

### COUNT III – UNJUST ENRICHMENT/CONSTRUCTIVE TRUST

83. Except to the extent inconsistent with the relief requested in the Count, PharMerica incorporates by reference the allegations set forth above.

84. PharMerica has conferred a benefit on Defendants by providing them with valuable pharmaceutical goods and services delivered to the residents and patients of the skilled nursing facilities owned and operated by the Defendants.

85. Defendants have not paid PharMerica for those pharmaceutical goods and services.

86. PharMerica's goods and services were provided under circumstances pursuant to which Defendants should have known that PharMerica would expect to be compensated for such goods and services.

87. Defendants wrongfully and intentionally withheld payment from PharMerica for the goods and services PharMerica provided.

88. Consequently, Defendants have been unjustly enriched through receipt of such goods and services at the expense of PharMerica.

89. Furthermore, Defendants have knowingly and willfully received, or will receive, reimbursement by Medicare, directly or indirectly, for goods and services provided by PharMerica, and have wrongfully and intentionally withheld or will withhold such amounts from PharMerica.

90. Defendants have a legal and fiduciary duty to immediately remit proceeds received in reimbursement from Medicare to PharMerica if they have not timely paid invoices as required by the PSA.

91. It is against equity and good conscience to permit Defendants to retain the Medicare reimbursements without paying for pharmaceutical goods and services provided by PharMerica for which reimbursements were made.

92. For these reasons, a constructive trust should be imposed on any and all proceeds which have been, or hereafter are, received by Defendants as reimbursement by Medicare for goods and services provided by PharMerica, plus interest, costs, and attorneys' fees.

### COUNT IV – ATTORNEYS' FEES

93. Except to the extent inconsistent with the relief in this count, PharMerica incorporates by reference the allegations set forth above.

94. Pursuant to the PSA, Defendants agreed to pay PharMerica its costs, including attorneys' fees, incurred in connection with collecting payment from Defendants.

95. Pursuant to and the Settlement Agreements, Defendants agreed to pay PharMerica all reasonable costs and expenses of collection, including but not limited to, reasonable attorneys' fees and court costs in any action or proceeding enforcing the Settlement Agreements

and executing upon the Agreed Orders. Defendants further agreed to pay all reasonable fees and disbursements of attorneys incurred before such action or proceeding is commenced, and before, during, and after any trial, arbitration, or mediation; and on any appeal, whether the action or proceeding is at law, in equity, or in any bankruptcy case or proceeding.

96. Defendants have failed to fulfill their obligations under the PSA and the Settlement Agreements to pay PharMerica what it is owed. PharMerica has incurred attorneys' fees and other costs in connection with its efforts to collect payment under the PSA and the Settlement Agreements, which are the responsibility of Defendants. PharMerica is likely to incur substantial additional attorneys' fees and costs as this case is litigated, which shall also be the responsibility of Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, PharMerica requests judgment against Defendants as follows:

A. Entry of the Agreed Orders of Judgment as set forth above;

B. An award of damages in an amount to be proven at trial;

C. PharMerica's attorneys' fees, expenses and costs associated with its collection of amounts owed to it by Defendants;

D. Prejudgment and post-judgment interest; and

E. All other relief to which PharMerica may be entitled.

Dated:  November 13, 2018	Respectfully submitted,

/s/ Jennifer Metzger Stinnett
Jennifer Metzger Stinnett
Matthew C. Williams
FULTZ MADDOX DICKENS, PLC
101 S. Fifth Street, 27th Floor
Louisville, Kentucky 40202-3116
(502) 588-2000
jstinnett@fmdlegal.com
mwilliams@fmdlegal.com

*Counsel for Plaintiffs*